UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| WALLACE BRISCOE, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:20-cv-00091-JMS-MG |
| ) | |
| WEXFORD OF INDIANA, LLC, et al. ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Wallace Briscoe is a prisoner at Putnamville Correctional Facility. He brings this lawsuit alleging that Dr. Pablo Perez, Nurse Cheryl Petty, Nurse Susan Moothery, and Wexford of Indiana, LLC were deliberately indifferent to his serious medical needs. His allegations include the denial of a wedge pillow for congestive heart failure, the denial of medication for high blood pressure, the denial of a diabetic medical diet, and the failure to order daily tests and fasting labs to monitor his blood sugar. The defendants have moved for summary judgment. For the reasons explained below, the motion for summary judgment is **GRANTED**.

**I. SUMMARY JUDGMENT STANDARD**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Com. Schools*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Community Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017).

## II. BACKGROUND

### A. Mr. Briscoe's Claims

The complaint makes the following allegations. Mr. Briscoe suffers from several chronic medical conditions, including congestive heart failure, high blood pressure, and diabetes. He underwent triple bypass surgery in 2016. As a result, he has chronic pain around his collar bone near the site of incision. He also experiences pain from acid reflux. He was prescribed a wedge pillow, which alleviates this pain by evenly distributing his weight and elevating his head above his chest while he sleeps. He was also prescribed nitroglycerin and blood pressure medications. *See* dkt. 1 (the complaint); dkt. 11 (screening order).

Mr. Briscoe was transferred to Putnamville Correctional Facility on November 8, 2019. He was housed in a segregation unit for the first six days due to bed shortages but was later moved to general population. He was initially deprived of nitroglycerin medication, which was kept with his property rather than given to him to keep on his person. He was also deprived of his wedge pillow. *Id.*

Mr. Briscoe had an appointment with Nurse Petty on December 19, 2019, and an appointment with Dr. Perez on December 23, 2019. He also had interactions with Nurse Moothery. Mr. Briscoe alleges that Dr. Perez and Nurse Moothery denied his request for a wedge pillow and

that Nurse Petty discontinued his blood pressure medications. Dkt. 1, p. 5. He alleges that Wexford "operated at a reduced cost to deny medical devices" such as wedge pillows, *id,* and that Nurse Petty failed to treat him during the December 19 appointment because she claimed he was argumentative, *id.* at 6.

He alleges that unnamed Wexford employees "went against their own treatment protocol by not ordering fasting labs" before they drew blood to monitor his blood sugar levels. *Id.* at 6. He also alleges that he was denied daily blood draws to monitor his blood sugar, *id.* at 5-6, and that he was denied his prescribed medical diet through the end of November 2019, *id.* at 4.

Based on these allegations, the Court allowed Mr. Briscoe's Eighth Amendment medical claims to proceed against Dr. Perez, Nurse Petty, and Nurse Moothery in their individual capacities. Dkt. 11, p. 3. The Court also allowed his Eighth Amendment medical claim to proceed against Wexford on the theory that Wexford maintains a policy or custom of denying necessary medical equipment, such as wedge pillows, to cut costs. *Id.*

### B. Evidence in the Record

The defendants have submitted the following evidence in support of their motion for summary judgment: Mr. Briscoe's deposition, dkt. 48-1; Dr. Perez's affidavit, dkt. 48-2; Nurse Petty's affidavit, dkt. 48-3; Nurse Moothery's affidavit, dkt. 48-4; and Mr. Briscoe's medical records, dkt. 48-5.

Mr. Briscoe has submitted the following evidence in opposition to the motion for summary judgment: a verified response brief, dkt. 53; a prescribed diet card, dkt. 53-1, p. 1; a property receipt for his wedge pillow, *id.* at 2-3; request for healthcare forms, *id.* at 4-5, 7; correspondence from Wexford regarding his medical diet, *id.* at 6; medical records from an appointment with Dr. Perez on February 6, 2020, *id.* at 8-10; and orders to continue his medical diet that were issued

by Dr. Perez and Nurse Petty, *id.* at 11-12. The Court considers all this evidence in the light most favorable to Mr. Briscoe.

### C. Mr. Briscoe's Medical Care at Putnamville Correctional Facility

Mr. Briscoe has several chronic medical conditions, including hypertension, hyperlipidemia, non-insulin-dependent diabetes, congestive heart failure, and coronary artery disease. Dkt. 48-2, para. 16. He underwent a triple bypass surgery during his confinement at the Marion County Jail in 2016. Dkt. 48-1, pp. 28-29.

When he arrived at Putnamville in November 2019, Mr. Briscoe had prescriptions for twelve different medications:

- Maxzide for high blood pressure
- Losartan for high blood pressure
- Coreg, a beta blocker for high blood pressure
- Lipitor for high cholesterol
- Nitrostat for chest pain
- Isosorbide mononitrate for chest pain
- Glipizide to control high blood sugar for diabetes
- Metformin to control high blood sugar for diabetes
- Flomax to improve urination
- Ferrous sulfate to supplement iron intake
- Aspirin to treat general pain and / or fever
- Timolol drops to treat high pressure inside the eyes

Dkt. 48-3, paras. 11-22.

Mr. Briscoe had a medical intake appointment upon his arrival on November 8, 2019. Dkt. 48-5, pp. 34-41. He had a blood pressure measurement of 140/80. *Id.* at 34. This is considered high, but it is not a "hypertensive crisis," which occurs when there is a systolic reading of 180 or above or a dystolic reading of 120 or above. Dkt. 48-3, para. 25.

Mr. Briscoe had an appointment with Nurse Petty on December 19, 2019. *Id.* at 26. He had met Nurse Petty before; she was previously a nurse at Marion County Jail and treated him around the time of his bypass surgery. Dkt. 48-1, p. 39. Mr. Briscoe asked Nurse Petty to

review whether he could be removed from any of his twelve prescriptions. *Id.* at 75-76. Nurse Petty reviewed his medications and discontinued his prescriptions for ferrous sulfate, Flomax, Maxzide, and Lorsartan. *Id.* at 79-80. Mr. Briscoe objected to being removed from Maxzide and Lorsartan at the same time, but he had no objection to being removed from the other medications. *Id.* at 82. The appointment ended prematurely because Mr. Briscoe became argumentative and refused to let Nurse Petty speak, which prevented her from providing additional treatment. Dkt. 48-5, pp. 6-7. Nurse Petty ordered a diabetic medical diet for Mr. Briscoe and referred him for a follow-up appointment with Dr. Perez. *Id.* at 7.

Mr. Briscoe met with Dr. Perez four days later on December 23, 2019. *Id.* at 9-12. Dr. Perez reinstated his prescription for Maxzide. Dkt. 48-1, p. 81. At his deposition, Mr. Briscoe explained that he had a supply of Maxzide that he was allowed to keep on his person, that he picks up a new supply every week or so, and that there was no disruption in his ability to take Maxzide as a result of Nurse Petty's decision to discontinue this medication on December 19. *Id.* at 83-84.

Dr. Perez reviewed Mr. Briscoe's chronic medical conditions at the appointment on December 23. Dkt. 48-2, paras. 16. His blood pressure was stable at 142/80. *Id.* at para. 17. His hyperlipidemia was normal. *Id.* at para. 18. He was not experiencing chest pain, shortness of breath, or labored breathing, and his cardiovascular system had a normal rhythm, with no murmur, gallops, or rubs. *Id.* at paras. 20-22. His glycated hemoglobin (A1C) was 8.3, but he did not want to begin taking insulin for his diabetes. *Id.* at para. 19.[1]

---

[1] The defendants have not provided the Court with any context for whether an A1C of 8.3 is normal. The Cleveland Clinic indicates that an A1C of 7 or lower is the goal for someone trying to manage their diabetes. *See* https://my.clevelandclinic.org/health/diagnostics/9731-glycosylated-hemoglobin-test-a1c; *see also Rowe v. Gibson*, 798 F.3d 622, 628-29 (7th Cir. 2015) (courts may take judicial notice of medical information on reputable websites at summary judgment when "the evidence presented by the defendants on summary judgment . . . was sparse" and the information presented on the website is non-controversial).

Dr. Perez determined there were no objective, clinical findings suggesting that Mr. Briscoe needed a wedge pillow for his congestive heart failure, based on his medical training and expertise. *Id.* at paras. 24-25. According to Dr. Perez, a wedge pillow may be beneficial in select cases of congestive heart failure when the patient presents with shortness of breath, swelling in the legs, and fluid in the heart or lungs—none of which Mr. Briscoe had at the appointment on December 23. *Id.* at paras. 11-13.

Dr. Perez next met with Mr. Briscoe on February 6, 2020. *Id.* at para. 26. At this appointment, Mr. Briscoe complained of chest pain in his collarbone near the incision site from his bypass surgery. *Id.* at para. 27; dkt. 48-1, p. 87. The pain was alleviated by Nitrostat, an oral medication which Mr. Briscoe kept on his person and was able to take as needed. Dkt. 48-2, paras. 28-33. Dr. Perez ordered a chest x-ray, which did not reveal any changes to the area of the chest plate that was opened during the bypass surgery. *Id.* at para. 37. He also ordered an EKG, which showed a normal sinus rhythm, and an echocardiogram, which indicated that there was no congestive fluid in Mr. Briscoe's heart. *Id.* at paras. 36, 39-40; dkt. 48-5, pp. 17-18. Dr. Perez submitted a request for an offsite consultation with a cardiologist, which was denied by Wexford's Regional Medical Director. Dkt. 48-2, para. 38.

Based on these observations and his medical training and expertise, Dr. Perez determined that Mr. Briscoe did not need a wedge pillow to treat his congestive heart failure. *Id.* at 41-42. Dr. Perez wrote Mr. Briscoe a prescription for Pepcid to alleviate discomfort from acid reflux. Dkt. 48-1, p. 94. Mr. Briscoe testified that Pepcid was effective. *Id.*

### D. Authority to Order a Wedge Pillow

During the time relevant to this lawsuit, Nurse Moothery was the Health Services Administrator at Putnamville Correctional Facility. Dkt. 48-4, para. 6. She did not have the

authority to order a wedge pillow for Mr. Briscoe. *Id.* at paras. 11-12. Instead, the request needed to be made by a medical provider, such as a physician, a physician's assistant, or a nurse practitioner. *Id.* at para. 13. Once the provider made this request, it would be reviewed by the Regional Medical Director. *Id.* at para. 14. If the request was approved, custody staff would be contacted to ensure there were no safety or security concerns regarding the device. *Id.* at para. 15.

At his deposition, Mr. Briscoe testified that Nurse Moothery had the authority to order a wedge pillow but refused. Dkt. 48-1, p. 53. He then clarified that he did not actually know how this process worked, and that he was making an assumption about her ability to order or request a wedge pillow based on his interactions with a previous Health Service Administrator who helped him acquire prescription shoes for his diabetes. *Id.* at 53-54.

### E. Wexford Policies or Customs

At his deposition, Mr. Briscoe testified that he was not aware of a Wexford policy that prohibits prisoners from obtaining wedge pillows for congestive heart failure. Dkt. 48-1, p. 96. He has not submitted evidence of any express policies in opposition to the motion for summary judgment. *See generally* dkts. 53, 53-1. Nor has he not provided evidence that any other prisoners have been denied a wedge pillow. *See* dkt. 48-1, p. 99. He testified that Dr. Perez told him the custody staff at Putnamville prohibits prisoners from receiving wedge pillows. *Id.* at 89.

### F. Medical Diet

Mr. Briscoe received multiple orders for a medical diet to accommodate his diabetes during the time relevant to this lawsuit. *See* dkt. 48-5, pp. 33, 42; dkt. 53-1, p. 12. At his deposition, Mr. Briscoe testified that he did not receive this medical diet for the first few weeks that he was at Putnamville. Dkt. 48-1, p. 40. He clarified that he believes unnamed Wexford employees

7

prohibited him from obtaining his medical diet, and he holds Nurse Petty accountable for their conduct because she supervised other members of the medical staff. *Id.* at 40-42.

### G. Blood Sugar Monitoring

At his deposition, Mr. Briscoe was asked about his claims for failure to adequately monitor his blood sugar. Dkt. 48-1, pp. 45-48. He testified that he believed he should have been receiving daily blood sugar tests when he first arrived a Putnamville and was not receiving his medical diet. *Id.* at 46. However, he never received an order from a medical provider for daily blood sugar tests, and he does not know who is responsible at Putnamville for administering blood sugar tests. *Id.* at 45, 46-47.

### H. Motion for Summary Judgment

In the motion for summary judgment, the defendants argue that they were not personally involved in the denial of Mr. Briscoe's diabetic diet or his blood sugar tests. Dkt. 48, p. 2. Wexford argues that Mr. Briscoe lacks personal knowledge to testify about a policy or custom of denying requests for wedge pillows. *Id.* Dr. Perez argues that his decision not to request a wedge pillow for Mr. Briscoe was based on his professional medical judgment that a wedge pillow was not necessary. *Id.* Nurse Moothery argues that she had no authority to request or order a wedge pillow for Mr. Briscoe. *Id.* And Nurse Petty argues that Mr. Briscoe suffered no harm as a result of her decision to remove him from two blood pressure medications during their appointment on December 19. *Id.*

In his response, Mr. Briscoe argues that Wexford should be held liable for the misdeeds of its employees. Dkt. 53, pp. 1-2. He does not argue that Wexford has a policy of custom of denying wedge pillows as a treatment for congestive heart failure. To the contrary, he concedes that Wexford does allow prisoners to receive wedge pillows, as Wexford provided him with a wedge

pillow before he was transferred to Putnamville. *Id.* at 9. He argues that Nurse Petty and Dr. Perez denied his access to a prescribed medical diet for diabetes, *id.* at 5, that Nurse Perez's decision to remove him from Losartan and Maxzide left him "unprotected and susceptible to serious bodily harm," *id.* at 4, that Dr. Perez was deliberately indifferent for overruling a previous physician's request to let Mr. Briscoe have a wedge pillow, *id.* at 6-8, and that Nurse Moothery misled him about the proper authority to speak with to request a wedge pillow, *id.* at 8-9.

### III. DISCUSSION

#### A. Deliberate Indifference Standard

Mr. Briscoe asserts Eighth Amendment medical claims against the defendants. At all times relevant to his claims, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have

known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotations omitted).

"To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Plummer v. Wexford Health Sources, Inc.*, 609 F. App'x 861, 862 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (internal quotation omitted). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

### B. Claim against Wexford

Mr. Briscoe brings his Eighth Amendment claims under 42 U.S.C. § 1983. To prevail on a § 1983 claim against a private corporation acting under color of state law, such as Wexford, Mr. Briscoe must establish that the corporation maintained a policy or custom and that caused him to suffer a constitutional deprivation. *Walker v. Wexford Health Sources*, 940 F.3d 954, 966 (7th Cir. 2019). Wexford cannot be held liable under § 1983 for the actions of its individual employees on a theory of *respondeat superior*. *Simpson v. Brown County*, 860 F.3d 1001, 1005 (7th Cir. 2017).

In the complaint, Mr. Briscoe alleges that Wexford has a policy or custom of denying prisoners access to wedge pillows in order to save money. Dkt. 1, p. 5. He has not presented evidence of an express policy or a widespread custom; indeed, he has not shown that any prisoner has been denied a wedge pillow except himself. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782 at 796 (7th Cir. 2014) ("isolated incidents do not add up to a pattern of bad behavior that would support an inference of a custom or policy."); *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (holding 4 incidents over 11 months involving only the plaintiff was insufficient to show a widespread practice or custom).

In his response brief, Mr. Briscoe abandons his policy or custom claim in favor of an argument that Wexford should be held liable for the actions of its individual employees, *i.e.*, Dr. Perez and Nurse Moothery, for refusing to request a wedge pillow for him because Wexford profited from their conduct. Dkt. 53, pp. 1-2, 9. This is essentially a *respondeat superior* claim, which is not permissible under § 1983. Accordingly, the motion for summary judgment is **GRANTED** as to the claims against Wexford.

### C.  Claims arising from Nitroglycerin, Medical Diet, and Blood Sugar Tests

Mr. Briscoe alleges that he was denied access to his nitroglycerin medication and was denied his prescribed medical diet for diabetes when he was first transferred to Putnamville. He also alleges that he should have been given daily blood sugar tests during that time and that someone should have notified him in advance of his A1C blood draw so he could fast for an hour beforehand. However, he has not submitted any evidence that the defendants were personally involved in any of these alleged deprivations. To the contrary, the evidence shows that they did not meet with Mr. Briscoe until at least December 19, and there is no evidence that they were responsible for serving his meal trays, administering his nitroglycerin medication, scheduling

11

blood sugar tests, or communicating with him in advance of his A1C blood draw. In fact, the only personal involvement Nurse Petty and Dr. Perez had regarding his medical diet was to submit orders for him to receive this diet.

"[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.... A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.")).

Because Mr. Briscoe has not submitted evidence that any of the defendants were personally involved in depriving him access to his nitroglycerin medication, his prescribed medical diet, daily blood sugar tests, or notice in advance of his A1C blood draw, the motion for summary judgment is **GRANTED** as to these claims.

### D.  Remaining Claim Against Nurse Moothery

Mr. Briscoe claims that Nurse Moothery was deliberately indifferent to his serious medical need because she refused to order or request a wedge pillow for him. However, the uncontradicted evidence shows that Nurse Moothery was not authorized to make such a request or order. Instead, the request had to be made by a provider, such as Dr. Perez, and then approved by the Regional Medical Director and custody staff. Although at one point in his deposition Mr. Briscoe claimed that Nurse Moothery, as the Health Services Administrator, was authorized to request or order the wedge pillow, he later clarified that he had no personal knowledge about the process of requesting and ordering medical devices at Putnamville during the time relevant to this lawsuit. Thus,

Nurse Moothery was not personally involved in the decision to deny his request for a wedge pillow, and the motion for summary judgment is **GRANTED** as to this claim.

### E. Remaining Claim Against Dr. Perez

Mr. Briscoe claims Dr. Perez was deliberately indifferent to his serious medical need because he refused to request a wedge pillow for him. He argues that a wedge pillow was necessary to treat his congestive heart failure, acid reflux, and chronic pain from his triple bypass surgery. The Court finds that the combination of these ailments amounts to a serious medical need. The Court also finds that Dr. Perez was personally involved in this deprivation, as he was the physician who treated Mr. Briscoe and denied the request. However, the Court finds that Dr. Perez's refusal to request a wedge did not amount to deliberate indifference.

Dr. Perez met with Mr. Briscoe multiple times and conducted physical exams in response to his complaints of pain and discomfort. He also ordered an EKG, a chest x-ray, and an echocardiogram, and requested a consultation with an offsite cardiologist. Based on his professional medical judgment, Dr. Perez concluded that Mr. Briscoe did not need a wedge pillow to treat his congestive heart failure because he did not have fluid in the heart or lungs, shortness of breath, or swelling in the legs. However, he treated Mr. Briscoe's chest pain with Nitrostat and treated his acid reflux with Pepcid, both of which were effective.

The fact that Dr. Perez's refusal to request a wedge pillow seems to be at odds with another physician's earlier assessment, without more, does not amount to deliberate indifference. *See Pyles*, 771 F.3d at 409. The Court finds that Dr. Perez was entitled to rely on his professional medical judgment and that the totality of his care for Mr. Briscoe's conditions did not fall below the standard required under the Eighth Amendment. Accordingly, the motion for summary judgment is **GRANTED** as to this claim.

### F. Remaining Claim Against Nurse Petty

Mr. Briscoe claims that Nurse Petty was deliberately indifferent for discontinuing all of his blood pressure medication at the same time following their appointment on December 19. As an initial matter, this statement is incorrect. Mr. Briscoe had prescriptions for three different blood pressure medications—Coreg, Maxzide, and Losartan. Nurse Petty discontinued his prescriptions for Maxzide and Losartan but continued his prescription for Coreg. She also scheduled an appointment for December 23 with Dr. Perez, who resumed his prescription for Maxzide. Furthermore, because Mr. Briscoe had a supply of both medications that he kept on his person, Nurse Petty's decision to discontinue these medications did not disrupt Mr. Briscoe's access to Maxzide, and his blood pressure remained stable between these two appointments.

Given that Nurse Petty did not remove Mr. Briscoe from all of his blood pressure medications at once, that she scheduled a follow-up appointment with a physician, that his access to Maxzide was never disrupted, and that his blood pressure remained stable, the Court finds there is no evidence that Nurse Petty left him "unprotected and susceptible to serious bodily harm," as Mr. Briscoe alleges. *See* dkt. 53, p. 4. Accordingly, the motion for summary judgment is **GRANTED** as to this claim.

### IV. CONCLUSION

For the reasons explained above, the defendants' motion for summary judgment, dkt. [48], is **GRANTED**. The action is **DISMISSED**. Final judgment in accordance with this Order shall now issue.

The defendants filed a motion to strike Mr. Briscoe's surreply in accordance with S.D. Ind. Local Rule 56-1(d). *See* Surreply at dkt. 56 and Exhibit at dkt. 56-1. This local rule prohibits surreplies on summary judgment unless the moving party submits additional evidence or

challenges the admissibility of the non-moving party's evidence in the reply; and even then, the surreply must be limited to the new evidence and objections. In this case, the defendants did not submit new evidence or challenge the admissibility of Mr. Briscoe's evidence in their reply. Accordingly, the motion to strike, dkt. [57], is **GRANTED**.

Mr. Briscoe was allowed to proceed in this action without prepaying the filing fee. Instead, he was allowed to pay an initial partial filing fee of $9.84, and the Court issued a collection order directing monthly payments from Mr. Briscoe's inmate trust account to recover the remaining balance. *See* dkts. 9, 28. Mr. Briscoe has filed a motion asking the Court to revise the collection order to exclude income he receives in the form of gifts from family members and "state pay deductions." Because the Court has no authority to grant it, his motion, dkt. [64], is **DENIED**.

   **IT IS SO ORDERED**.

Date: 1/11/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

WALLACE BRISCOE, JR.
860657
PUTNAMVILLE - CF
PUTNAMVILLE CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Heather Terese Gilbert
CASSIDAY SCHADE LLP
hgilbert@cassiday.com

Marley Genele Hancock
CASSIDAY SCHADE LLP
mhancock@cassiday.com

15